**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

CONNECTICUT ASSOCIATION
OF HEALTH CARE FACILITIES, INC.    :
                 Plaintiff,    :
                                 :
                  v.    :    Civ. No. 3:10CV136(PCD)
M. JODI RELL, in her official capacity
as Governor of the State of Connecticut, and
MICHAEL P. STARKOWSKI,
in his official capacity as Commissioner of
Social Services.    :
                 Defendants.    :

**RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO DISMISS**

Plaintiff Connecticut Association of Health Care Facilities, Inc. ("CAHCF") brings this six count complaint against M. Jodi Rell and Michael P. Starkowski in their official capacities. Plaintiff alleges that section 32 of Connecticut Public Act 09-5 ("section 32") is procedurally and substantively preempted by the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A). Plaintiff also alleges violations of its rights under 42 U.S.C. § 1396a(a)(30)(A) and 42 U.S.C. § 1396a(a)(13)(A) as well a taking of private property in violation of the Fifth Amendment of the United States Constitution and article I, section 11 of the Connecticut Constitution. Plaintiff moves for a Preliminary Injunction enjoining the enforcement of section 32 [Doc. No. 15]. Defendants oppose this motion and move pursuant to FED. R. CIV. P. 12(b)(6) to dismiss all counts of the complaint [Doc. No. 39]. The two motions will be addressed together, as they raise similar issues and the parties filed consolidated briefs.

In short, Plaintiff alleges that the methods and procedures the State of Connecticut uses to determine reimbursement rates to Medicaid participating nursing facilities is preempted by the "equal access" provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A). Plaintiff argues that

the method used to set rates conflicts with federal requirements and that the payments do not assure efficient, economic or quality care and do not afford Medicaid beneficiaries equal access to nursing home services. (Compl. ¶ 1.)  Plaintiff also argues that Connecticut violated its rights by not complying with the procedures set out in 42. U.S.C. § 1396a(a)(13)(A) and effecting an unconstitutional taking of facilities' expected financial returns.

For the reasons stated herein, Plaintiff's motion is **denied** and Defendants' motion is **granted in part and denied in part.**

## I.      BACKGROUND

The following facts are recited according to the complaint.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Plaintiff CAHCF is a not-for-profit trade association representing Connecticut health care facilities that provide long-term subacute and rehabilitative services. CAHCF's member institutions serve over 14,000 Connecticut citizens.[1]  (Id.)  Defendant M. Jodi Rell is the Governor of the State of Connecticut and is sued in her official capacity only. Defendant Michael P. Starkowski is the Connecticut Commissioner of Social Services and is sued in his official capacity only.

Medicaid is a cooperative federalism program, authorized by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid Act").  Under the Medicaid program, the federal government provides states with matching federal funds which are used by the states to

---

[1]      There are approximately 238 licensed nursing facilities and 28,000 nursing facility beds in Connecticut.  About 18,000 of these beds are paid for by Medicaid.  The majority of the 238 facilities are for-profit entities. They range in size from 30 to over 300 beds and are supported by Medicaid, Medicare and private pay revenue. (Id. ¶¶ 26-30.)

provide health care goods and services to certain low-income and disabled individuals.  Although

a state's participation in Medicaid is voluntary, once a state chooses to participate, it must

comply with the regulations in the Medicaid Act.  A state must also submit a state plan for

medical assistance to the Centers for Medicare & Medicaid Services ("CMS"), a component of

the United States Department of Health and Human Services.  The state plan must be approved

by CMS.

The regulations at issue in this case are § 1396a(a)(30)(A), which states:

A State plan for medical assistance must . . . provide such methods and procedures
relating to the utilization of, and the payment for, care and services available under the
plan (including but not limited to utilization review plans as provided for in section
1903(i)(4) [42 USCS § 1396b(i)(4)]) as may be necessary to safeguard against
unnecessary utilization of such care and services and to assure that payments are
consistent with efficiency, economy, and quality of care and are sufficient to enlist
enough providers so that care and services are available under the plan at least to the
extent that such care and services are available to the general population in the geographic
area.

and § 1396a(a)(13)(A), which states:

A State plan for medical assistance must provide -
for a public process for determination of rates of payment under the plan for hospital
services, nursing facility services, and services of intermediate care facilities for the
mentally retarded under which--
        (i) proposed rates, the methodologies underlying the establishment of such rates,
and justifications for the proposed rates are published,
        (ii) providers, beneficiaries and their representatives, and other concerned State
residents are given a reasonable opportunity for review and comment on the proposed
rates, methodologies, and justifications,
        (iii) final rates, the methodologies underlying the establishment of such rates, and
justifications for such final rates are published.

Connecticut participates in Medicaid and receives federal matching funds.  The

Connecticut Department of Social Services ("DSS") is the state agency responsible for

administering Connecticut's Medicaid program.  Under Connecticut law, Medicaid

-3-

participating nursing facilities are paid a facility specific per diem rate for each Medicaid beneficiary they serve.  The rate is calculated annually for the time period July 1 through June 30 of the following year. (Id. ¶¶ 33-34.)  Each year, participating facilities must submit cost reports detailing their expenditures in five different categories. (Id. ¶¶ 35-36.)  Medicaid reimbursement rates are then calculated based on 'allowable costs,' or costs reasonably and directly related to the provision of services necessary for patient care. CONN. AGENCIES REGS. §17-311-52(i).  Allowable costs are limited by statutory ceilings, based on a percentage of the median costs of facilities with the same license type and location. CONN. GEN. STAT. § 17b-340(f)(3).  The regional consumer price index is then used to inflate costs from the cost year to the rate year. (Compl. ¶ 43.)

"Rebasing" occurs periodically to assess and incorporate cost changes to a facility's payment rate.  Rebasing involves recalculating and adjusting allowable costs to reflect more current cost data. (Id. ¶¶ 43-44.)  Prior to the enactment of section 32, CONN. GEN. STAT. § 17b-340(f)(8) required DSS to rebase nursing facilities' allowable costs "no less frequently than every four years."  Rebasing last occurred in fiscal year 2006. (Id. ¶ 47.)  However, according to Plaintiff, in practice, the "stop-gain provision," CONN. GEN. STAT. § 17b-340(f)(4), acts as a ceiling on the per diem rate paid to a facility in disregard of the computation of allowable costs.  The stop-gain provision limits a nursing facility's annual rate to a specific state-wide percent increase over the previous year's rates.[2]  The rate setting

_____

[2]     For example, for the fiscal year ending June 30, 2007, each facility was limited to a rate three per cent greater than the rate in effect for the period ending June 30, 2006, except that any facility that was issued a lower rate for the period ending June 30, 2007 than for the rate period ending June 30, 2006 was issued such rate as of July 1, 2006. Similarly, for the fiscal year ending June 30, 2008, each facility was limited to a rate two

methodology also includes an exception whereby financially troubled facilities may be awarded "interim rates" if the facility's request meets statutory standards of financial need, long-term viability and demand in the geographic area.

Plaintiff argues that the rates set by Connecticut's most recent state budget do not adequately reflect the cost of providing nursing home care to Medicaid patients and therefore undermines the quality and equity of the system.  Plaintiff asserts that section 32 of the budget, which froze reimbursements by implementing a zero percent stop-gain increase and not rebasing existing rates in 2010, eliminated the relationship between provider's costs and Medicaid per diem rates. (Compl. ¶¶ 60-63.)

Public hearings on the Connecticut House of Representatives budget bill were conducted from February 9, 2009 to February 23, 2009.  Testimony concerning nursing facilities' medicaid payment rates was presented on February 18, 2009. (Id. ¶¶ 88-89.) Testimony relating to social services and the Connecticut Senate budget bill was heard on March 3, 2009. (Id. ¶ 95).  On May 18, 2009, the Appropriations, Aging, Human Services and Public Health Committees held a joint information forum on nursing home funding and the state budget. (Id. ¶ 107.)  Plaintiff argues that despite these hearings, the state's obligations under 42 U.S.C. § 1396a(a)(30)(A) and 42 U.S.C. § 1396a(a)(13)(A) were not met during the budgeting process or by the enacted budget.

---

and nine-tenths percent greater than the rate in effect for the period ending June 30, 2007, except that any facility that was issued a lower rate for the period ending June 30, 2008 than for the rate period ending June 30, 2007 was issued such lower rate effective July 1, 2007.  For the fiscal year ending June 30, 2009, rates in effect for the period ending June 30, 2008 remained in effect until June 30, 2009, except that any facility that was issued a lower rate for the fiscal year ending June 30, 2009 was issued such lower rate. (Id. ¶ 50.)

Throughout the summer of 2009, Connecticut's government faced a budget impasse. The Connecticut General Assembly did not pass the bills first introduced in February 2009 and discussed in the hearings.  However, the various versions of the budget, including the bill discussed at the hearings and the bill eventually signed into law, all proposed the same Medicaid per diem rates.  After inaction by the General Assembly on the Governor's first proposed budget, Governor Rell introduced a second budget on May 28, 2009.  The General Assembly convened a special session but the fiscal year began without a budget.  Governor Rell signed an executive act to continue the operation of the State until a new budget could be signed into law.  Finally, a fourth proposed budget was introduced and passed by both the House and Senate.  It became law without the Governor's signature on September 8, 2009. On October 5, 2009, Governor Rell signed the bill which became Public Act 09-5, September Special Session, 2009.

Section 32 of Public Act 09-5 freezes nursing facility Medicaid reimbursement rates until July 1, 2011. (Id. ¶ 8.)  It eliminated scheduled 2010 rate rebasing and amended the stop-gain provision to state that rates in effect for the period ending June 30, 2009 will remain in effect until June 30, 2011.[3]  In addition, beginning in fiscal year 2011 and continuing thereafter, one-half of each facilities' June payments will be delayed until July. (Id. ¶ 153.)  The Connecticut Office of Fiscal Analysis found that these amendments would

---

[3]        Section 32 amended Connecticut's stop-gain provision by adding the following to section 17b-340(f)(4) of the Connecticut General Statutes: "For the fiscal years ending June 30, 2010, and June 30, 2011, rates in effect for the period ending June 30, 2009, shall remain in effect until June 30, 2011, except any facility that would have been issued a lower rate for the fiscal year ending June 30, 2010, or the fiscal year ending June 30, 2011, due to interim rate status or agreement with the department, shall be issued such lower rate."

reduce state spending by $115.3 million in fiscal year 2010 and $166.4 million in fiscal year 2011. (Id. ¶¶ 85-87).  While these motions were pending, CMS approved this amendment to the state plan. (Mann letter, Doc. No. 53.)  Plaintiff argues that this legislation violates its rights under the procedures set forth in 42 U.S.C § 1396a(a)(13)(A) and conflicts with procedural and substantive requirements found in 42 U.S.C. § 1396a(a)(30)(A).

## II.    STANDARD OF REVIEW

### A. Preliminary Injunction

In order to obtain a preliminary injunction in this circuit, the movant must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (per curiam); see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 206-07 (2d Cir. 1979); Western Publishing Co. v. Rose Art Indus. Inc., 910 F.2d 57, 59 (2d Cir. 1990).

### B.  Motion to Dismiss

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "is merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof."  Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)).  In ruling on a motion under FED. R. CIV. P. 12(b)(6), the court

may consider only "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp, 482 F.3d 184, 191 (2d Cir. 2007).

The district court may dismiss a claim under FED. R. CIV. P. 12(b)(6) only if the plaintiff's factual allegations are not sufficient "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft, 129 S. Ct. at 1949.

For the purposes of a motion to dismiss, the court must take all of the factual allegations in the complaint as true.  However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.  Although detailed factual allegations are not required, a plaintiff must provide the grounds of its entitlement to relief beyond mere "labels and conclusions." Bell Atlantic, 550 U.S. at 555.


**III.     DISCUSSION**

**A.  Governor Rell as a Defendant**

Defendant Rell argues that she is not a proper Defendant in this action because the complaint does not fall within the Ex parte Young exception to Eleventh Amendment immunity as applied to her.  The Eleventh Amendment bars suits against the state in federal court. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984).  However, "where the state itself or one of its agencies or departments is not named as defendant and

-8-

where a state official is named instead, the Eleventh Amendment status of the suit is less straightforward. "Ex parte Young held that a suit to enjoin as unconstitutional a state official's action was not barred by the Amendment. This holding was based on a determination that an unconstitutional state enactment is void and that any action by a state official that is purportedly authorized by that enactment cannot be taken in an official capacity since the state authorization for such action is a nullity." Papasan v. Allain, 478 U.S. 265, 276 (1986) (citing Ex parte Young, 209 U.S. 123 (1908)); see also Burgio and Campofelice, Inc. v. NYS Dep't of Labor et al., 107 F.3d 1000, 1006 (2d Cir. 1997) ("The Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws.").

To fall within this exception, the defendant state officer "must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." Ex parte Young, 209 U.S. at 157 (noting that the constitutionality of every act passed by a state legislature cannot be tested by a suit against the governor based solely on the theory that the governor is charged with the execution of state laws). Plaintiff argues that Governor Rell is connected to section 32 because she introduced the original budget bill during the state budgetary process. However, this connection does not satisfy the exception's requirement that the defendant officer have some connection with the *enforcement* of the act.

Plaintiff also argues that Governor Rell is a proper party because she has a general duty to execute and enforce state laws. However, a "particular duty to enforce the statute in question" and a "demonstrated willingness to exercise that duty" is needed for a state officer to be a proper defendant under Ex parte Young. Reynolds v. Blumenthal, No. 3:04cv218,

2006 WL 2788380, at *8 (D. Conn. Sept. 26, 2006) (internal citations omitted).  "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law.  Holding that a state official's obligation to execute the laws is a sufficient connection to the enforcement of a challenged statute would extend <u>Young</u> beyond what the Supreme Court has intended and held." <u>Children's Healthcare is a Legal Duty v. Deters</u>, 92 F.3d 1412, 1416 (6th Cir. 1996) (internal citations omitted); <u>see also</u> <u>Shell Oil Co. v. Noel</u>, 608 F.2d 208, 211 (1st Cir. 1979) ("The mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute.").  Finding otherwise would allow the exception to become the rule and abrogate state immunity.

Therefore, all counts of the complaint are **dismissed as to Defendant Rell**.  This dismissal does not prejudice Plaintiff because the complaint is properly brought against the Commissioner of Social Services.

### B.  Preemption; counts I and II

Plaintiff argues that section 32 conflicts with and is therefore preempted by 42 U.S.C. § 1396a(a)(30)(A).  Plaintiff states this claim in two counts, count I alleges that section 32 is preempted by § 1396a(a)(30)(A)'s procedural requirements.  Count II alleges that section 32 is preempted by its substantive requirements.  Defendants counter that 42 U.S.C. § 1396a(a)(30)(A) cannot be enforced under the supremacy clause because Congress did not intend to preempt state laws concerning rate setting by the enactment of 42 U.S.C. § 1396a(a)(30)(A).  While Defendants are correct in stating that Congress did not intend to preempt the entire Medicaid field, as the program requires federal and state cooperation, a state statute may preempted by a direct and specific conflict with federal law even in a field

that Congress did not wholly preempt.

In New York State Dep't of Soc. Serv., et al. v. Dublino et al., 413 U.S. 405 (1973), the Supreme Court addressed preemption in a cooperative federal and state program analogous to Medicaid.  In Dublino, New York public assistance recipients challenged New York's work rules as preempted by the work rules provision of the Social Security Act.  The Court first held that Congress had not intended to preempt state work programs because coordinate state and federal efforts existed within a complementary administrative framework.  The Court nevertheless remanded for consideration of whether there was a "specific conflict between the state and federal programs, free from its misapprehension that the work rules had been entirely preempted."  Id. at 422.

Noting that Congress did not intend to preempt the field of Medicaid reimbursement therefore does not end our inquiry.  Any "state statute is void [under the supremacy clause] to the extent it conflicts with a federal statute - if, for example, compliance with both federal and state regulations is a physical impossibility or where the law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Maryland v. Louisiana, 451 U.S. 725, 746 (1981) (internal citations omitted).  This Court must determine whether section 32 presents a specific conflict to the accomplishment of the purposes and objectives of 42 U.S.C. § 1396a(a)(30)(A).

Defendants also argue that this case falls under Seminole Tribe of Florida v. Florida, 517 U.S. 44, 45 (1996), in which the Supreme Court held that "where, as here, Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an Ex parte Young action."  However, unlike the Indian Gaming Regulatory Act ("IGRA")

-11-

examined in <u>Seminole Tribe</u>, the Medicaid Act does not contain a detailed remedial scheme. The Medicaid Act's provision granting oversight of state reimbursement rates to CMS is not analogous to the remedial scheme examined in <u>Seminole Tribe</u>. The IGRA provided "intricate procedures" and proscribed sanctions against states for failure to follow regulations. Although the Medicaid Act requires federal agency approval of state reimbursement rates, unlike the IGRA, it does not include sanctions or any remedies for noncompliance.

Other courts have also found that <u>Seminole Tribe</u> is inapplicable to the Medicaid Act. The Fourth Circuit held that "in designing an act in which a State could participate entirely or not at all, such as the Medicaid Act, Congress has not prescribed a detailed remedial scheme for dealing with noncompliance with the Act once a state elects to participate. On the contrary, the Supreme Court has concluded that the Medicaid Act does not provide the type of detailed remedial scheme that would supplant an <u>Ex parte Young</u> action." <u>Antrican v. Odom</u>, 290 F.3d 178, 190 (4th Cir. 2002). The First and Sixth Circuits have reached the same conclusion. <u>See</u> <u>Rosie D. v. Swift</u>, 310 F.3d 230, 236 (1st Cir. 2002) (holding that unlike the IGRA, "the Medicaid Act contains no comprehensive set of remedies" and <u>Ex parte Young</u> actions are therefore proper); <u>Westside Mothers v. Haveman</u>, 289 F.3d 852, 862 (6th Cir. 2002) (holding that the Medicaid Act provision allowing the secretary to reduce or cut state funds "is not a detailed 'remedial' scheme . . . .")

Furthermore, the Second Circuit has held that the Medicaid Act can preempt state statutes in the case of a specific conflict.[4] Although the Second Circuit cases do not involve

---

[4]     Defendants also attempt to use <u>Burgio</u>, 107 F.3d at 1006-07, which distinguishes claims under the Supremacy Clause from claims for enforcement of a federal law, to bolster

§ 1396a(a)(30)(A), they clearly show that if a state's Medicaid laws result in a specific

conflict with the Medicaid Act, the state law is preempted to the extent of the conflict. See

Catholic Med. Ctr. of Brooklyn and Queens, Inc. v. Rockefeller, 430 F.2d 1297, 1298-99 (2d

Cir. 1970) (holding sections of the Public Health Law of the State of New York in violation

of the Supremacy Clause "insofar as they forbid full payment to hospitals" and are therefore

in conflict with 42 U.S.C. § 1396a(a)(13)(D)); Pharmaceutical Soc'y of the State of N.Y. Inc.

v. N.Y. State Dep't of Soc. Serv., 50 F.3d 1168 (2d Cir. 1995) (holding New York law on

pharmacist reimbursement preempted by the Medicaid Act "to the extent that the state's co-

payment system results in the reduction of payments to pharmacists as a result of non-

payment of co-payments").

   Defendants note that the Medicaid Act provisions at issue in both Catholic Med. Ctr.

and Pharmaceutical Soc'y were more specific than the equal access provision.  However,

while the equal access provision's lack of specificity means that Plaintiff might have

difficulty proving conflict, it does not follow that a state law could *never* conflict with, and

therefore be preempted by, the equal access provision.  The provision requires that states

reach the result of "efficiency, economy, and quality of care and are [sic] sufficient to enlist

enough providers so that care and services are available under the plan at least to the extent

that such care and services are available to the general population in the geographic area."

Minnesota Pharmacists Ass'n v. Pawlenty, Civ. No. 09-2723, 2010 WL 561473, at *10 (D.

Minn. Feb. 10, 2010).  It is possible that Plaintiff could prove that section 32 precludes these

---

  their argument that Plaintiff cannot bring an Ex parte Young action under the Medicaid
  Act.  However, the Second Circuit's distinction between claims for enforcement and
  claims under the Supremacy Clause does not aid this analysis.  As stated above, Plaintiff
  must prove an actual conflict under the Supremacy Clause in order to prevail.  Plaintiff's
  claims for enforcement are addressed separately below.

results and is therefore preempted by the equal access provision.

### 1. Procedural Requirements in the Equal Access Provision

Plaintiff's count I alleges that section 32 conflicts with the procedural requirements of

42 U.S.C. § 1396a(a)(30)(A) and is therefore null and void.  Again, this provision states:

A State plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1903(i)(4) [42 USCS § 1396b(i)(4)]) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

Plaintiff argues that this wording requires states to consider efficiency, economy, quality of care

and equal access during the rate setting process by examining cost studies and proposed rates'

impact on each statutory factor - apart from state budgetary concerns - before setting

reimbursement rates. (Pl.'s Br. Prelim. Injunction 29-30.)

The circuit courts that have addressed the issue are split as to whether the equal access

provision includes procedural requirements for rate setting or whether it only requires states to

meet a substantive result.  The Eighth and Ninth Circuits have found that in order show

compliance with the equal access provision, a state must provide evidence that it specifically

considered the statutory factors and relied on cost studies when setting the appropriate rate.  In a

recent line of cases, the Ninth Circuit enjoined California's ten percent rate cut on

reimbursements to inpatient services for failure to "provide any evidence that the Department or

the legislature studied the impact of the ten percent rate reduction on the statutory factors of

efficiency, economy, quality, and access to care prior to enacting AB5, nor did [they]

demonstrate that the Department considered reliable cost studies when adjusting its

-14-

reimbursement rates." Indep. Living Ctr. of S. California, Inc. v. Maxwell-Jolly, 572 F.3d 644,

651-52 (9th Cir. 2009).[5]  However, the Third and Seventh Circuits disagree, finding that the

provision mandates only that states produce a certain result.[6]  The Second Circuit has yet to

address the issue.

This Court agrees with the Third and Seventh Circuits and holds that the equal access

provision does not contain procedural requirements.  Based on the statutory language, legislative

history and what it finds to be unpersuasive reasoning by the Ninth Circuit.  First, the plain

language of § 1396a(a)(30)(A) does not require any specific procedures.  The language mandates

that "a state plan for medical assistance must provide such methods and procedures relating to

the *utilization of, and the payment for,* care and services available under the plan . . . (emphasis

added)."  The term "methods and procedures" modifies "utilization and payment for."  The

statute does not mandate "methods and procedures relating to" the *setting of rates.*  Furthermore,

the statute gives no elaboration as to what possible procedures might be required.  When

Congress mandates procedures for rate setting, it does so specifically.  For example, elsewhere in

the same act, Congress specified rate setting procedures.  42 U.S.C. § 1396a(a)(13)(A) does not

---

[5]        See also California Pharmacists Ass'n. v. Maxwell-Jolly, 596 F.3d 1098 (9th Cir. 2010);
Minnesota Homecare Ass'n, Inc. et al. v. Gomez, 108 F.3d 917, 918 (8th Cir. 1997) ("The
Medicaid Act mandates consideration of the equal access factors of efficiency, economy,
quality of care and access to services in the process of setting or changing payment rates,
however, it does not require the State to utilize any prescribed method of analyzing and
considering said factors."); Arkansas Med. Soc'y. Inc. v. Reynolds, 6 F.3d 519 (8th Cir.
1993) (holding that rates cannot be enacted solely for budgetary reasons); Ohio Hosp.
Ass'n et al. v. Ohio Dep't of Human Serv., 579 N.E.2d 695 (Ohio 1991) (same).

[6]        Methodist Hosp. v. Sullivan, 91 F.3d 1026, 1030 (7th Cir. 1996) ("Nothing in the
language of § 1396a(a)(30), or any implementing regulation, requires a state to conduct
studies in advance of every modification. It requires each state to produce a result, not to
employ any particular methodology for getting there."); Rite Aid of Pennsylvania, Inc. et
al. v. Houstoun, 171 F.3d 842, 851 (3d Cir. 1999) (rejecting the Ninth Circuit's approach
and holding that "section 30(A) mandates only substantive compliance").

simply use the term "methods and procedures" but requires "a public process," that the "proposed rates are published" and an "opportunity for review and comment."  If Congress had intended to require the consideration of cost studies, it would have written that requirement into the Medicaid Act.

Second, the legislative history of the Medicaid Act evidences Congress' intent that the equal access provision requires only substantive results.  In 1980, Congress amended the Medicaid Act by passing the Boren Amendment, the former 42 U.S.C. § 1396a(a)(13)(A). "Under the amendment, providers had a substantive right to reasonable and adequate reimbursement rates, and a procedural right to have such rates accompanied by findings and assurances, made by the state, as to their reasonableness and adequacy." In re NYAHSA, 318 F. Supp. 2d 30, 32 (N.D.N.Y. 2004), aff'd, 444 F.3d 147 (2d Cir. 2006).  In 1997, however, Congress repealed the Boren Amendment, and in its stead, enacted the current § 1396a(a)(13)(A), with its notice and comment procedures. Id.  Courts have contrasted the equal access provision to the Boren Amendment, noting that the equal access provision is primarily concerned with benefitting Medicare recipients. Id. at 39 ("unlike the Boren Amendment § 1396a(a)(30)(A) . . . evinces no direct concern for the economic situation of providers.  Instead . . . it manifests concerns solely for the well-being of recipients."); Methodist Hosp. v. Sullivan, 91 F.3d 1026, 1030 (7th Cir. 1996) (the equal access provision "is in this respect unlike the Boren Amendment, which requires the state to adopt rules that the state finds, and makes assurances satisfactory to the secretary, are reasonable and adequate to achieve identified objectives."). Providers formerly had the procedural rights Plaintiff now claims, but they were specifically repealed by Congress.  It is illogical to argue that the procedural requirements survived in another provision focused on a different concern.

Third, this Court finds the reasoning of <u>Indep. Living Ctr. of S. California, Inc.</u>, 572 F.3d at 653-54, and related cases unpersuasive for several reasons.  In that case, the court stated that, with the enactment of § 1396a(a)(30)(A), "Congress intended payments to be flexible within a range; payments should be no higher than what is required to provide efficient and economical care, but still high enough to provide for quality care and to ensure access to services."  The court then continued to reason that this purpose could not be accomplished without a determination of costs, and therefore the statute requires cost studies prior to setting rates. <u>Id.</u>  This Court is not persuaded that it must evaluate the legislative or administrative process that led to particular rates in order to determine whether the rates comply with § 1396a(a)(30)(A) by ensuring efficiency, economy, quality of care and equal access to services.  While it is quite possible that studies are necessary to fulfill Congressional intent, when a statute mandates a result but its wording does not specify a process, it is not the province of the courts to decide what process is necessary to attain compliance.  Even if the Ninth Circuit is correct, and cost studies are necessary to accomplish the statute's purpose, it does not follow that it is necessary to judge compliance by looking to rate setting procedure.  Compliance may still be determined by examining the results.

Furthermore, when a statute mandates a result but its wording does not specify a process, federal courts do not have the expertise to determine what process is necessary to attain compliance. Here, under the approach of the Ninth Circuit, courts would have to determine the kind and number of studies necessary as well as whether legislatures sufficiently relied on them. In <u>California Pharmacists Ass'n v. Maxwell-Jolly</u>, 596 F.3d 1098, 1109 (9th Cir. 2010), the Ninth Circuit held that California's pre-enactment study of the rate reductions' impact was inadequate. The court, however, further complicated the issue by failing to specify what quantity or quality of fact-finding would have sufficed.  Given that courts do not have the expertise to impose and

-17-

evaluate procedural requirements, they should defer to the state legislatures and CMS.  It is the province of the legislature and other state agencies to weigh competing goals and various findings of fact to determine how best to comply with § 1396a(a)(30)(A).  It is the province of CMS, the agency Congress specifically designated to do so, to oversee this process and the choices of the legislature.  It is highly unlikely that despite its silence on the issue, Congress intended the courts to assume a robust role in rate setting.

For the reasons stated above, this Court finds that 42 U.S.C. § 1396a(a)(30)(A) does not contain a procedural requirement, it mandates only a substantive outcome.  Therefore, as to **count I**, **Plaintiff's Motion for a Preliminary Injunction is denied and Defendants' Motion to Dismiss is granted.**

### 2.  Section 32 and the Equal Access Provision

Although this Court finds that the equal access provision does not contain a procedural requirement, the preemption inquiry is not yet finished.  Courts agree that the equal access provision contains a substantive requirement.[7]  Therefore, if Plaintiff could prove that section 32 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Maryland v. Louisiana, 451 U.S. at 746, it would be preempted.  To any extent that section 32 is an obstacle to the realization of "efficiency, economy and quality of care" or is insufficient "to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the

---

[7]      Methodist Hosp. v. Sullivan, 91 F.3d 1026, 1030 (7th Cir. 1996) ("Nothing in the language of § 1396a(a)(30), or any implementing regulation, requires a state to conduct studies in advance of every modification. It requires each state to produce a result, not to employ any particular methodology for getting there."); Rite Aid of Pennsylvania, Inc. et al. v. Houstoun, 171 F.3d 842, 851 (3d Cir. 1999) (rejecting the Ninth Circuit's approach and holding that "section 30(A) mandates only substantive compliance"); In re NYAHSA, 318 F. Supp. 2d 30, 32 (N.D.N.Y. 2004), aff'd, 444 F.3d 147 (2d Cir. 2006).

geographic area" it would be void.  Whether the rate freeze is so drastic that it affords Medicaid patients unequal access to nursing home care is a fact intensive inquiry that is not appropriate for a Motion to Dismiss.  Therefore, as to **count II, Defendants' Motion to Dismiss is denied.**

### 3.  *Motion for a Preliminary Injunction*

We must then turn to Plaintiff's Motion for a Preliminary Injunction based on this count. In order to obtain a preliminary injunction in this circuit, the movant must demonstrate: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc., 596 F.2d at 72.  Plaintiff faces a difficult burden.  Because its arguments concerning procedure have been dismissed, a preliminary injunction will only be ordered if Plaintiff can prove a likelihood of success on the question just posed: does section 32's rate freeze result in inefficient, uneconomic, low quality nursing home care or inequality for Medicaid recipients?

While these motions were pending, CMS approved the amended Connecticut state plan, including the rates at issue in this litigation. (Mann letter, Doc. No. 53.)  Defendants argue that this approval is entitled to Chevron deference.  Although CMS was not construing a silent or ambiguous statute, Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837 (1984), in this circuit "we accord CMS's [decision] considerable deference, whether under Chevron or otherwise. As the Supreme Court recently noted, even relatively informal [CMS] interpretations, such as letters from regional administrators, 'warrant respectful consideration' due to the complexity of the statute and the considerable expertise of the administering agency." Community Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir. 2002).  Although this Court will carefully examine the record before it, it will give considerable deference to CMS's expert determination that

-19-

Connecticut's amended state plan complies (and therefore could not conflict) with federal law. Furthermore, states currently face difficult financial times and choices  must be made among worthy but competing goals.  The Court recognizes that enjoining section 32 would require not just a change to Medicaid rates but a re-allocation of the entire Connecticut state budget.  Under the deferential standard, and in light of these economic circumstances, the Court does not find that Plaintiff has shown a likelihood of success on the merits.[8]

Much of Plaintiff's factual argument concerns the procedure by which the rate freeze was enacted.  However, this evidence is not relevant to a results focused inquiry.  The crux of Plaintiff's result-focused argument is that "the financial condition of Connecticut's nursing facilities has been precarious for years, as evidenced by the numerous bankruptcies and state receiverships that have plagued the industry . . . the significant payment cut effected by section 32 has and will continue to exacerbate this dire situation." (Pl.'s Br. Prelim. Injunction 3.)

Plaintiff argues that the stop-gain provision, especially the October 2009 amendment, "has eliminated the relationship between facilities' allowed costs and the Medicaid rate ultimately issued, such that the current system does not adequately reflect the actual costs of wages, benefits and staffing." (Id. 9.)  Plaintiff's strongest argument is that even according to the state's own calculations, the new reimbursement rates are significantly lower than costs.  For fiscal years 2010 and 2011, reimbursement rates for the seven representative institutions are between $2 and $28 less than allowable costs.[9] (November 17, 2009 DSS letters; Pl.'s App. 4:868a table combining

---

[8]     Were the Court to reach a balance of hardships analysis, it would also favor Defendants in light of the economic crisis and the difficulty of passing and implementing a state budget.

[9]     Defendants proffer Connecticut's reimbursement rate relative to other states as evidence of compliance with § 1396a(a)(30)(A).  The Court finds this argument unpersuasive as the cost of providing care is higher in Connecticut than most states.

financial figures; Pl.'s App. 879a.-917a expert report.)  Plaintiff's brief (as well as the amicus brief submitted by the Connecticut Association of Not-for-Profit Providers for the Aging) focuses on proving that the gap between costs and reimbursement rates will negatively influence the institutions' financial situations.  This argument cannot be denied.  However, Plaintiff is unable to show to a strong likelihood that the financial impact is so dire as to affect Medicaid beneficiaries' equal access to efficient, economic and quality care.

Plaintiff gives very little evidence as to the actual effects of section 32.  Plaintiff does not, for example, show that institutions face an inability to purchase supplies at an efficient rate or that they have been forced to cut services.  Nor does Plaintiff provide evidence that Medicaid beneficiaries spend longer periods on waiting lists than private payers or that facility closures have left the state with an inadequate bed supply. See Ralabate v. Wing, No. 93-CV-0035E1996, U.S. Dist. LEXIS 9410, at *22 (W.D.N.Y. June 27, 1996) (comparing the rate at which the general population has access to a specific medical service to the rate at which Medicaid beneficiaries can receive the same service.)  Plaintiff does argue that increasing nursing home closures, including three closures in the month prior to the Appropriations Committee hearing, are the direct result of inadequate funding and the rate freeze.  On February 18, 2009, Toni Fatone, Plaintiff's executive vice president, testified before the Appropriations Committee that five facilities were currently in bankruptcy, ten were in the receivership program and three had announced closures since the first of the year. (Pl.'s App. 38a.)  Fatone attributed these closures to inadequate funding. (Id.)  In speaking to the Journal Inquirer, Fatone predicted additional closings and layoffs. (Pl.'s App. 54a.)  The chair of the Connecticut Association of Not-for-Profit Providers for the Aging also testified before the Appropriations Committee that the proposed rates would have a devastating effect on the level of services, undermining providers ability to provide quality care and to procure

-21-

equipment needed to modernize care.  He agreed with Fatone that the rate freeze would lead to increased closings and bankruptcies. (Pl.'s App. 64a.)

However, the record reflects a strong possibility that the closures are due to factors aside from section 32.[10]  Defendants counter that closures reflect decreasing demand for nursing home services due to increased use of assisted living homes, the DSS home care program, elders with higher income and other new initiatives. (See Pl.'s App. 161a.)  Defendants' position is supported by the fact that although the number of available beds has decreased, the utilization rate has also decreased. (Id. 101a.)  State-wide, nursing homes are only at 91% occupancy, (Id. at 190a.) suggesting that recent closures might result from excess supply instead of under funding.

In addition, the interim rate provision was not changed under section 32.  Connecticut facilities in serious financial difficulty may still apply for emergency rates unaffected by section 32, providing case by case relief from the rate freeze.  Defendants correctly argue that this provision may be used to prevent closures which would affect access to service.

Given that the record reflects plausible factual arguments by both parties and this Court's deference to CMS's approval of the plan, Plaintiff has not shown a likelihood of success on the merits.  As Plaintiff cannot meet this factor of the test for a preliminary injunction, it is unnecessary to address the other prongs.  Plaintiff's **Motion for a Preliminary Injunction is denied.**

**C. Section 1983, counts III and IV**

Plaintiff alleges violations of 42 U.S.C. § 1396a(a)(30)(A) and 42 U.S.C. §

---

[10]  Although Plaintiff and several witnesses before the Appropriations Committee argued that nursing home closures were on the rise, from 2004 through 2009 closures held steady at one to three per year. (Pl.'s App. 38a.)

1396a(a)(13)(A) pursuant to 42 U.S.C. § 1983.  Section 1983 provides a private right of action

against any person who, acting under the color of state or territorial law, abridges "rights,

privileges, or immunities secured by the Constitution and laws" of the United States. See Maine v.

Thiboutot, 448 U.S. 1, 4 (1980).  In order to seek redress under section 1983, a plaintiff "must

assert the violation of a federal right" and not merely a violation of federal law. Pennsylvania

Pharmacists Assoc. v. Houstoun, 283 F.3d 531, 535 (3d Cir. 2002).  In order for a statute to create

a right enforceable under section 1983, "the provision in question must have been 'intend[ed] to

benefit the putative plaintiff.'" Id. (citing Wilder v. Virginia Hosp. Ass'n,

496 U.S. 498, 509 (1990)).

However, every circuit court to address this issue since the Supreme Court decision in

Gonzaga University v. Doe, 536 U.S. 273 (2002), has found that neither of the Medicaid Act

provisions at issue create rights enforceable through section 1983.  In Minnesota Pharmacists

Ass'n v. Pawlenty, Civ. No. 09-2723, 2010 WL 561473, at *10 (D. Minn. Feb. 10, 2010), the

court recently summarized the state of the law regarding parties' ability to bring a claim under the

equal access provision pursuant to § 1983.

> Moreover, since the Supreme Court in Gonzaga clarified the applicable analysis of
> whether a particular federal statute created rights that are enforceable in a Section 1983
> action, all five of the federal circuits that have addressed the precise question here-whether
> the Equal Access provision of Subsection (30)(A) creates such enforceable rights-have
> ruled that no Section 1983 action was permissible. Equal Access for El Paso, Inc. v.
> Hawkins, 509 F.3d 697 (5th Cir.2007); Mandy R. v. Owens, 464 F.3d 1139 (10th
> Cir.2006); Westside Mothers v. Olszewski, 454 F.3d 532 (6th Cir.2006); Sanchez v.
> Johnson, 416 F.3d 1051 (9th Cir.2005); Long Term Care Pharmacy Alliance v. Ferguson,
> 362 F.3d 50 (1st Cir.2004). In fact, one of those circuits recognized that Gonzaga, whether
> 'a tidal shift or merely a shift in emphasis,' was a controlling intervening precedent that
> effectively negated that circuit's pre- Gonzaga decision to the contrary. Long Term Care
> Pharmacy Alliance, 362 F.3d at 58-59.

All courts to address the issue have held that the equal access provision was not intended to benefit providers.  Providers therefore do not have enforceable rights under the provision. Pennsylvania Pharmacists Ass'n, 283 F.3d at 537-38.  Courts have made the same finding in relation to § 1396a(a)(13)(A). See HCMF Corp. v. Gilmore, 26 F. Supp. 2d 873, 880 (W.D. Va. 1998); Evergreen Presbyterian Ministries Inc. v. Hood, 235 F.3d 908, 919 n.12 (5th Cir. 2000).

Moreover, the Second Circuit specifically held that "health care providers had no enforceable federal rights under §§ 1396a(a)(13)(A) and 1396a(a)(30)(A)."  N.Y. Ass'n of Homes & Servs. for the Aging, Inc. v. DeBuono, 444 F.3d 147, 148 (2d Cir. 2006) (per curiam) (upholding and adopting district court decision in In re NYAHSA, 318 F. Supp. 2d at 38-40.).  The law is clear that providers cannot bring section 1983 actions claiming a violation of their rights under either provision of the Medicaid Act.  Therefore, counts III and IV are dismissed.

## D. Takings Clause, counts V and VI

Plaintiff's final counts allege an unconstitutional taking under the United States and Connecticut Constitutions.[11]  Plaintiff alleges "a legally cognizable property interest in receiving a reasonable return on the value of their [sic] property, which includes their [sic] nursing facilities and the services provided therein." (Compl. ¶¶ 197, 202.)  The threshold question in any takings case is whether the plaintiff has a protected property interest.  See Story v. Green, 978

---

[11]     Article I, section 11 of the Connecticut Constitution states that "the property of no person shall be taken for public use, without just compensation therefor."  Plaintiff's claim under this clause will be not be analyzed separately from its Fifth Amendment claim because the Connecticut Supreme Court has "never interpreted the two provisions to require different analysis." Bauer v. Waste Management of Connecticut, Inc., 662 A.2d 1179, 1195 n.16 (Conn. 1995).

F.2d 60, 62 (2d Cir. 1992).  Plaintiff is unable to make this showing.  Plaintiff's members have

no property interest either in future Medicaid reimbursements or in a "reasonable return" on the

value of their property.  Property interests arise from state law and Plaintiff has not identified any

feature of Connecticut law that affords a property interest in a reasonable return on property or in

future reimbursements.  Furthermore, "a 'reasonable return' is not protected by law in this

circuit. [The Second Circuit] rejected the notion that loss of profit -- much less loss of a

reasonable return -- alone could constitute a taking." Rent Stabilization Ass'n v. Dinkins, 805 F.

Supp. 159, 163 (S.D.N.Y. 1992).  Similarly, the Second Circuit has held that "Medicaid

providers have no property right in prospective reimbursement payments." Grossman v. Axelrod,

646 F.2d 768, 771 (2d Cir. 1981).  Therefore, counts V and VI are dismissed.

## IV. CONCLUSION

For the foregoing reasons, **Defendants' Motion to Dismiss [Doc. No. 39] is granted in

part and denied in part** and **Plaintiff's Motion for Preliminary Injunction [Doc. No. 15] is

denied**.  In sum, the case will proceed only as to Count II against Defendant Starkowski.

SO ORDERED.

Dated at New Haven, Connecticut, this  2nd   day of June, 2010.

/s/
_____
Peter C. Dorsey
U.S. District Judge